Dorothy A. **GUSHEN**, *Widow and Adminis-tratrix* of the Estate of Joseph E. Gushen, Deceased, Plaintiff Below, Appellant,

v.

**PENN CENTRAL TRANSPORTATION COMPANY**, a Pennsylvania corporation, Defendant Below, Appellee.

Supreme Court of Delaware.

June 11, 1971.

Bruce M. Stargatt, and Arthur Inden, of Young, Conaway, Stargatt & Taylor, Wilmington, for appellant.

Robert K. Payson, and Peter M. Sieglaff, of Potter, Anderson & Corroon, Wilmington, for appellee.

WOLCOTT, C. J., and CAREY and HERRMANN, JJ., sitting.

CAREY, Justice:

In this appeal from the Superior Court, the appellant, Dorothy A. Gushen, widow of Joseph E. Gushen and administratrix of his estate, seeks the reversal of a judgment entered upon a jury verdict in favor of appellee, Penn Central Transportation Company. Appellant's husband was killed in a collision between the car which he was driving and two trains operated by the appellee. The jury found that the appellee was guilty of negligence, but it also found that the deceased was guilty of contributory negligence. The Court below refused to submit to the jury the question of

whether or not the railroad company was guilty of willful or wanton conduct, as requested by the appellant.

The principal issue presented is whether the evidence would have justified the jury in finding willful or wanton conduct on the part of the railroad company. An additional question is raised concerning the propriety of a statement in the Court's charge to the effect that the widow could not recover for any amounts attributable to taxes on the deceased's earnings.

The collision which caused Mr. Gushen's death occurred at night late in December, 1966. The weather was stormy, and undoubtedly the distance from which a train would be visible was less than usual. He was driving south on Harmony Road in New Castle County. He first collided with a passenger train going east. This train pulled or pushed the automobile into another passenger train which was proceeding west. Mr. Gushen was immediately killed. At the time of this episode, both trains were moving at 80 miles per hour—the customary speed for passenger trains at this point.

In passing upon the present contention, we must accept as true that testimony most favorable to the appellant. The following statement of facts includes many matters as to which there is no dispute; as to any disputed matter, it follows the foregoing rule.

Harmony Road is a two-lane paved highway. In recent years, it has come to be a road on which automobile traffic is heavy. There are three sets of train tracks which cross that highway at the place where the present impact occurred. Those tracks are part of appellee's main line between Philadelphia and Baltimore. At the time of this accident, there was an average of about fifty freight and passenger trains per day crossing this intersection.

The road bed of Harmony Road across these tracks had for a number of months been in "deplorable" condition. Some parts of the space were covered with macadam, others with timbers. It had become rutted and bumpy to such an extent that an automobile could not traverse it safely at a speed of more than two or three miles per hour, according to some witnesses. Two light standards, one of which faced south and the other north, had been installed which flashed red lights when trains were approaching. However, for at least a year prior to this accident, the lights functioned improperly in that they would often light up when there were no trains approaching the crossing or in sight of it. These false warnings became so frequent that members of the public who were well acquainted with the crossing fell into a habit of disregarding the warning of the flashing lights; as one expert put it, the condition became a "booby trap" for those people who made regular use of the road. Moreover, in that expert's opinion, this particular crossing was so hazardous that, even if the lights had worked properly, the warning given by them would have been inadequate. In his opinion, the only proper safeguard would have been crossing gates.

The crossing was made even more hazardous by the fact that the railroad tracks were considerably lower than the ground on both sides thereof. It was a grade crossing and the highway sloped down to that level, with the result that a driver, because of the banks of earth on both sides of the road bed, could not see much of the track until he had reached a point very close to the crossing itself. The signal lights gave the only advance notice of a train's approach, unless the driver happened to hear the whistle. That fact made even more important the significance of the "booby trap" created by the frequent flashings of the signals when trains were not approaching; it caused the regular users of the highway to pay even less attention to those lights.

The conditions described above were well known to the proper officials of the appellee. For at least a year prior to this accident, various residents of the area had

**710**

complained of the situation by telephone, by letter, and by personal visits, to an officer of the appellee. Despite this knowledge, appellee did nothing to correct the situation, although T. 26 Del.C. § 517 imposes upon a railroad the duty to keep such passages or crossings in good repair.

 Numerous cases in this State have explained the meaning of "wanton conduct". McHugh v. Brown, Del.Supr., 11 Terry 154, 125 A.2d 583 (1956); Wilson v. Tweed, Del.Supr., 209 A.2d 899 (1965), among others. For present purposes, there is no need to review them. We think a jury might find that the appellee in this case was guilty of a "conscious indifference to consequences in circumstances where probability of harm" was reasonably apparent, when it must have been aware of the great hazard presented. In our opinion, the issue of wantonness on the part of the appellee should have been submitted to the jury.

This holding of course brings up the question of whether the deceased himself was guilty of wanton conduct. As we have said, the jury found that he was guilty of contributory negligence, which is not a defense available to a defendant whose conduct has been wanton. McLaughlin v. Rova Farms, Inc., 56 N.J. 288, 266 A.2d 284 (1970); Restatement, Torts, Sec. 482(1). In the latter situation, the question is whether the deceased was also guilty of wanton conduct. A finding to that effect would constitute a complete defense. Restatement, Torts, Sec. 482(2); Prosser on Torts (3rd Ed.) 436. Since no question of wantonness on the part of either party was presented to the jury at the trial, the jury had no opportunity to pass upon this point.

For the reasons stated, the judgment must be reversed and the case remanded for trial of these issues.

Since the case must be retried, we will state our views concerning the income tax question. In his charge to the jury, the trial Judge stated that the amount of any verdict for the plaintiff should exclude, *inter alia*, any income taxes on the possible future earnings of her husband. We pointed out in Abele v. Massi, Del. Supr., 273 A.2d 260 (1970), decided after the trial of the present case, that the impact of income taxes on future earnings is not to be taken into account in the determination of an award for loss of earnings. We then suggested an appropriate charge, which will doubtless be followed by the trial Judge on retrial of this case. Of course, in the *Abele* case, *supra*, the question was presented in a somewhat different context, but the same reasons for excluding consideration of income taxes applies to the present case. Smith v. Pennsylvania R. Co. (Ohio App.), 99 N.E.2d 501 (1950). The matter goes too far into the field of speculation and conjecture to serve as a practical aid in an area which already contains enough guesswork.

Reversed and remanded.